ACCEPTED
01-15-00600-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/30/2015 4:42:34 PM
CHRISTOPHER PRINE
CLERK

No. 01-15-00600-CV

_____

IN THE
FIRST COURT OF APPEALS
AT HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

7/30/2015 4:42:34 PM

CHRISTOPHER A. PRINE
Clerk

_____

*IN RE UNION PACIFIC RAILROAD COMPANY*

_____

From the 125th Judicial District Court of
Harris County, Texas
Cause No. 2014-23177

_____

## REAL PARTY IN INTEREST'S RESPONSE TO PETITION FOR WRIT OF MANDAMUS

_____

Levon Hovnatanian
State Bar No. 10059825
Hovnatanian@mdjwlaw.com
Dale Jefferson
State Bar No. 10607900
Jefferson@mdjwlaw.com
Martin, Disiere, Jefferson &
Wisdom, L.L.P.
808 Travis, 20th Floor
Houston, Texas 77002
713.632.1717
713.222.0101 fax

Vuk Vujasinovic
State Bar No. 00794800
Vuk@vbattorneys.com
Brian Beckcom
State Bar No. 24012268
Brian@vbattorneys.com
VB Attorneys
6363 Woodway Dr., Suite 400
Houston, Texas 77057
713.224.7800
713.224.7801 fax

*Appellate Counsel for Real Party in Interest,
Donald and Mary Trichel, Individually and as Permanent Co-Guardians of the
Person and Estate of Nicholas Trichel, Incapacitated*

# TABLE OF CONTENTS

Table of Contents ......................................................................................... i

Index of Authorities.................................................................................... iii

Statement of the Case ..................................................................................v

Issue Presented ........................................................................................... vi

Summary ....................................................................................................... 1

Statement of Facts ....................................................................................... 4

   1. Hampton and UP deny that Hampton's phone use was a cause of the crash in any way. ....................................................................................... 4

   2. Hampton and UP contend all the data on Hampton's phone was accidentally lost, and offer several conflicting stories for this loss of evidence. ...................................................................................................... 8

   3. Forensics expert Will Koenig has given extensive testimony on his data collection and preservation attempts, and offered numerous opinions to bolster Hampton and UP's contention of "accidental" data loss. ............................................................................................................ 10

   4. The phone data was destroyed during Koenig's delay in downloading and preserving the data. ............................................................................... 13

   5. Koenig's opinions have been disclosed and are disputed....................... 19

Argument ..................................................................................................... 20

   1. UP failed to satisfy its burden to prove its claims of privilege. ............. 21

   2. The consulting expert privilege never attached to any of Koenig's work or opinions.......................................................................................... 25

      2.1 Koenig's affidavit discloses his opinions and communications, not merely "factual matters." .............................................................................. 25

      2.2 UP did not designate Koenig as a consulting expert when it disclosed his affidavit. .............................................................................. 26

3.  UP waived any consulting expert privilege. ........................................... 27

    3.1  UP is using the Koenig affidavit offensively to try to obtain affirmative relief based on its claim that the Trichel family filed a groundless pleading in bad faith. .............................................................. 30

    3.2  Koenig's affidavit is not limited to "factual matters." ...................... 33

    3.3  UP's alleged invitation to participate jointly in the preservation of Hampton's phone is contrary to its assertions of privilege. ................... 34

4.  Koenig's affidavit has been reviewed by two testifying experts, allowing full discovery of Koenig's opinions under TRCP 192.3(e). ........ 36

5.  UP fails to address the bulk of the questions it instructed Koenig not to answer and has thus waived any objection to those questions. ................. 38

Prayer ........................................................................................................... 39

Rule 52.3(J) Certification ............................................................................ 40

Certificate of Service .................................................................................. 41

Certificate of Compliance .......................................................................... 42

**Cases** **Page**


*Cameron County. v. Hinojosa*,
    760 S.W.2d 742 (Tex. App.—Corpus Christi 1988, orig. proceeding).36


*Hardesty v. Douglas*,
    894 S.W.2d 548 (Tex. App.-Waco 1995, orig. proceeding)……………27


*In re DuPont de Nemours & Co.*,
    136 S.W.3d 218 (Tex. 2004)………………………………......……21, 23


*In re Ford Motor Co.*,
    988 S.W.2d 714 (Tex. 1998)…………………………………………23


*In re Ford Motor Co.*,
    165 S.W.3d 360 (Tex. 2005)…………………………………………21


*In re Kristensen*,
    Cause No. 14-14-00448-CV, 2014 Tex. App. LEXIS 8404; 2014 WL
    3778903 (Tex. App.—Houston [14th Dist.] July 31, 2014, orig.
    proceeding)……………………………………………………….21, 23


*In re Mendez*,
    234 S.W.3d 105 (Tex. App.—El Paso 2007)……………………….27


*In re Ortuno*,
    Cause No. 14-08-00457-CV, 2008 Tex. App. LEXIS 5511, 2008 WL
    2855028 (Tex. App.-Houston [14th Dist.] July 24, 2008, orig.
    proceeding)……………………………………………………27-29

*In re Taylor*,
　　113 S.W.3d 385 (Tex. App.—Houston [1st Dist.] 2003, no pet.)…....…20

*Jordan v. Court of Appeals for Fourth Supreme Judicial Dist.*,
　　701 S.W.2d 644 (Tex. 1985)……………………………………………28

*Martin v. Boles*,
　　843 S.W.2d 90 (Tex. App.—Texarkana 1992) …………………………37

*Mundy v. Shippers*, Inc.,
　　783 S.W.2d 743 (Tex. App.—Houston [14th Dist.]
　　1990, writ denied)……………………………………………………...26

*Tex. Dep't of Pub. Safety Officers Ass'n v. Denton*,
　　897 S.W.2d 757 (Tex. 1995)……………………………......………..33

*Tom L. Scott, Inc. v. McIlhany*,
　　798 S.W.2d 556 (Tex. 1990)…………………….…………27, 31-33

## **Rules**　　　　　　　　　　　　　　　　　　　　　　　**Page**

Tex. R. Civ. P. 192.3…………………………………..………………23, 36, 37

Tex. R. Civ. P. 192.5…………………………..…………………………23

Tex. R. Civ. P. 192.7………………………………………..……………23

Tex. R. Civ. P. 193.4…………………………………………………21, 23

Tex. R. Evid. 511………………………………………………………x, 29

## STATEMENT OF THE CASE

*Nature of the case*. Donald and Mary Trichel, Individually and as Permanent Co-Guardians of the Person and Estate of Nicholas Trichel, Incapacitated ("the Trichel family") sued the relator Union Pacific Railroad Company, asserting personal injury claims arising from a highway collision.[1]

*Course of Proceedings*. Asserting consulting-expert and work product privileges, Union Pacific instructed its expert witness not to answer questions that the Trichel family posed during a courthouse deposition.[2] The parties paused the deposition and called upon the respondent for a ruling.[3]

*Trial court disposition*: Finding that the consulting expert and work product privileges did not apply, the respondent overruled Union Pacific's objections.

---

[1] Tab 1 [Original Petition].
[2] Tab 14 [Koenig Deposition].
[3] RR 4 (Tab 16 June 24, 2015 hearing).

**ISSUE PRESENTED**

Whether it was a clear abuse of discretion for the respondent to overrule Union Pacific's consulting-expert and work-product privilege objections to justify the extraordinary relief of mandamus.

## SUMMARY

Union Pacific ("UP") claims all the data on the cellphone of its (former) employee Jeremy Hampton was accidentally deleted during a 39-day delay in the evidence preservation work of the company's forensics expert, Will Koenig. Specifically, all of the phone data was deleted during the evening of day 38 of Koenig's delay, which was the day before Koenig downloaded the phone and concluded all the data was gone.

The destruction of this data occurred on June 22, 2014, while Koenig was actively working with Hampton, the defense attorneys who were representing both Hampton and UP, and various UP personnel in allegedly trying to preserve the data on the phone. It occurred after UP allegedly gave specific instructions, verbally and in writing, to Hampton to preserve the data on his phone. It occurred after Koenig downloaded 1.15 Gbs of data from Hampton's phone 39 days prior on May 15, 2014, which Koenig claims he could not read for various technical reasons that are disputed by the Trichel family.

1

The record reflects three contradictory stories offered by UP as to why Hampton's phone data was destroyed: (1) Hampton allowed a Verizon store employee to reset his phone, not "fully realizing" this would delete all the data; (2) a Verizon employee reset Hampton's phone "inadvertently during the diagnosis of a battery problem"; and (3) Hampton allowed a Verizon employee to reset his phone because he thought all the data on it had already been preserved by Koenig.

When the spoliation issue related to Hampton's phone data was raised by the Trichel family, UP obtained a detailed, 981-word affidavit from Koenig. UP attached Koenig's affidavit to various pleadings to deflect blame for the spoliation to Hampton, and to seek affirmative relief from the Trichel family for what UP claims was a frivolous spoliation claim filed in bad faith.

Koenig was deposed on June 24, 2015. UP's counsel instructed Koenig not to answer multiple questions concerning Koenig's opinions and communications under claims of the consulting expert and work product privileges. UP also refused to produce multiple emails containing

communications with Koenig and other documents prepared by or for Koenig, claiming these same privileges. The bulk of these written materials falls on dates within the 39-day delay generated by Koenig's work and during which the phone data was destroyed.

The respondent overruled UP's privilege claims. The respondent's ruling should be upheld and writ should be denied for several reasons.

Most importantly, UP did not meet its burden to prove its privilege claims because UP did not offer any evidence supporting any of the alleged privileges, as required. In addition, the privileges never applied to Koenig in the first place, because his affidavit contains multiple opinions rather than merely factual matters, because UP never designated Koenig as a consulting or dual capacity expert, and because Koenig garnered information, data and the phone itself from the co-defendant Hampton, who does not seek mandamus relief. Moreover, UP waived any right to claim these privileges when it used Koenig's affidavit offensively in claiming the Trichel family filed a groundless pleading in bad faith. Finally, because Koenig's opinion-laden affidavit has been reviewed

3

by two testifying experts to date, the Trichel family is entitled to full discovery of all of Koenig's work, opinions and communications.

## STATEMENT OF FACTS

**1. Hampton and UP deny that Hampton's phone use was a cause of the crash in any way.**

Hampton was on the job with UP when the 18 wheeler he was driving was involved in a crash with a Ford Mustang driven by Nick Trichel.[4] The crash involved multiple impacts between the vehicles, ending when the rear wheels of the trailer rolled up and over the Mustang, crushing it and forcing it to crash into the cement barrier on the shoulder.[5]

The Harris County Constable's Office investigated and reconstructed the crash, and concluded it was caused solely by Hampton's unsafe lane change and inattention.[6] At the age of 26, Trichel suffered a permanent severe brain injury, and multiple other serious injuries, as a result of the crash.[7] Trichel's parents, Donald and Mary Trichel, have been appointed

---

[4] Tab 9, Exh. 5 [Police Report].
[5] Tab 9, Exh. 5, p. 5 [Police Report].
[6] Tab 9, Exh. 5, pp. 2 & 5 [Police Report].
[7] Tab 1, Plaintiff's Original Petition, p. 2.

the Permanent Co-Guardians of the Person and Estate of Nicholas Trichel, Incapacitated, by the Probate Court.[8]

Hampton had his cell phone with him inside the cab of the 18 wheeler at the time of the crash.[9] The Trichel family contends Hampton was using Facebook on his cell phone while driving the 18 wheeler in the time leading up to the crash, as well as at the time of the crash.[10] Hampton and UP deny this contention.[11] The Trichel family further contends Hampton's phone data that was deleted contained evidence that would further implicate Hampton in causing the crash.[12] Hampton and UP vacillate between selective ignorance and denying this contention.[13]

This was initially a hit-and-run, as Hampton kept right on driving after crushing Trichel's car.[14] Astoundingly, Hampton claims he did not

---

[8] In re: Guardianship of the Person and Estate of Nicholas Trichal (AKA "Nick Trichel), an alleged incapacitated person, Cause No. 433189 (Harris County Probate Court No. 3 Oct. 6, 2014).

[9] Tab 8, Exhs. C [Hampton 34-45] & F; Tab 9, Exh. 4.

[10] Tab 9, Exh. 4 [Printout of Hampton's Facebook Page]; Tab 8, Exh. F.

[11] Tab 8, Exh. C [Hampton 20]; Tab 11, p. 2.

[12] Tab 3, Plaintiff's First Amended Original Petition, p. 9.

[13] Tab 8, p. 5; Tab 11, p.5.

[14] Tab 9, Exh. 5 [Police Report].

know he was involved in a crash.[15]  Hampton claims his co-worker James Wilson, who was following him in a different UP truck, told him via cell phone that he had run over a car and needed to return to the scene.[16] Hampton returned to the scene 23 minutes after the crash.[17]

Paper records obtained from Hampton's cell phone provider (Verizon) show Hampton used his cell phone to do various things around the time of the crash.[18]  For example, Hampton was involved in 17 text message communications the day of the crash before it occurred, and 31 text messages the day of the crash after it occurred. [19]  After the crash on the day it occurred, Hampton engaged in 20 phone calls.[20]  Hampton used his phone to communicate with several individuals, including UP personnel, via text messages and phone calls during the 23 minutes it took him to return to the scene, as well as throughout the day of the crash as the

---

[15] Tab 8, Exh C [Hampton 118]; Tab 9, Exh. 5, p. 5.

[16] Tab 8, Exh. C [Hampton 118-121]; Tab 9, Exh. 5, p. 5.

[17] See Tab 9, p. 4 and Tab 9, Exh. 6 [James 78].

[18] Tab 8, Exh. E & Tab 9, Exh. 20 [Hampton's Cell Phone/Text Records].

[19] Tab 8, Exh. E; See also Tab 8, Exh. C [Hampton 156-60].

[20] Tab 9, Exh. 20.

Constables were investigating. [21]  Hampton also took photographs of the

accident scene with his cell phone (which to this date have not been

provided). [22]

However, the Verizon paper records do not reflect the content of

Hampton's communications before or after the crash, nor do they reveal

the photos he took at the scene. [23]  Nor do they reveal activities Hampton

could have been engaged in around the time of the crash in addition to

Facebooking, such as emailing, gaming, use of other apps, and internet

use. [24]  Hampton and UP deny Hampton was engaged in any such phone

activities that was a cause of the crash, and benefit from the destruction of

all the phone data that would have reflected such activities and their

content. [25]

---

[21] Tab 8, Exh. E; See also Tab 8, Exh. C [Hampton 104, 147-154].
[22] Tab 8, Exh. C [Hampton 163].
[23] Nor could Hampton recall the content of any of these communications.  Tab 8, Exh. C [Hampton 163].
[24] Tab 9, Exhs. 18 & 20; Tab 8, Exh. E.
[25] Tab 11, p. 2; Tab 8, Exh. C; Supp. Tab 18.

**2. Hampton and UP contend all the data on Hampton's phone was accidentally lost, and offer several conflicting stories for this loss of evidence.**

Hampton and UP contend all of the data that was on Hampton's phone as of the crash date has been destroyed.[26] The record reflects three contradictory stories offered by them for the loss of all this data.

One story is that Hampton brought his phone to a Verizon store and allowed a Verizon employee to reset his phone, not "fully realizing" this would delete all the data on his phone.[27] The second story is that a Verizon employee reset Hampton's phone "inadvertently during the diagnosis of a battery problem."[28] The third story is that Hampton allowed a Verizon employee to reset his phone because he thought all of the data on it had already been downloaded and preserved.[29]

---

[26] UP's Petition, p. 3; Tab 9, Exh. 1; Tab 10, p. 4.

[27] This is the most recent contention, asserted in the Petition for Writ of Mandamus, p. 3.

[28] This was the story provided by Union Pacific's counsel in an email included in the record at Tab 9, Exh. 1 [Rothman Oct. 3, 2014 email].

[29] This was asserted in Union Pacific's May 17, 2015 pleading titled "Defendant Union Pacific's Response to Plaintiffs' Motion to Compel Inspection of Jeremy Hampton's Phone, Phone Data and Computer for Proposes of Spoliation Issue" Tab 10, p. 4 (referring to Hampton testimony at Tab 8, Exh. C [Hampton 174-181]

Hampton and UP were initially represented by the same counsel, Kane Russell Coleman & Logan, P.C. ("KRCL"), for the 8-month period from the date of the crash through December 10, 2014.[30] KRCL, UP and Hampton all played an active role in activities that ended with the alleged loss of all data on Hampton's phone.[31] Hampton, however, does not seek mandamus relief.

UP claims that one of its representatives, William J. Green, told Hampton two days after the crash "to preserve their cell phones and not delete any data or photographs from them."[32] UP claims it issued a "legal hold order" six days after the crash, and on the same date "sent both Jeremy Hampton and James Wilson an email notice regarding the legal hold order."[33] UP also hired a forensics expert, Will Koenig, to preserve all the data on the cell phones of both Hampton and Wilson.[34]

---

[30] Tab 9, Exh. 13 [Order Granting Motion to Substitute Counsel for Jeremy Ray Hampton, December 10, 2014].
[31] Tab 8, Exh. B; Tab 8, Exh. C [Hampton 168-179].
[32] Tab 8, Exh. D [Affidavit of William J. Green].
[33] Tab 10, p. 6.
[34] Tab 10, p. 6; Tab 8, Exh. B [Koenig Affidavit].

**3. Forensics expert Will Koenig has given extensive testimony on his data collection and preservation attempts, and offered numerous opinions to bolster Hampton and UP's contention of "accidental" data loss.**

Will Koenig is the forensics expert chosen by UP to preserve the phone data, and whose opinions and communications UP seeks to conceal under a claim of privilege. In his affidavit, Koenig testifies "Franklin Data was retained by Union Pacific Railroad Company ('Union Pacific') to preserve data from the cell phones of James Wilson and Jeremy Hampton."[35] Koenig testifies about several meetings he had with Hampton, Wilson and KRCL attorneys, including meetings on May 13, 14 and 15, and June 23, of 2014.[36] During all these meetings, Koenig physically handled one or both of the cell phones and utilized various software tools that he chose in an attempt, allegedly, to extract data from the phones.[37]

Koenig testifies that during his May 13 download attempt of the co-worker's (Wilson's) phone, Wilson told him his phone was "crushed by

---

[35] Tab 8, Exh. B [Koenig Affidavit].
[36] Tab 8, Exh. B.
[37] Tab 8, Exh. B.

one of his horses," but he still had the same SIM card. [38]  Regardless,

Koenig claims this download was not completed because Wilson "needed

to leave." [39]

Koenig's May 14 download attempt of Wilson's phone was allegedly

cut short because it was "the end of Mr. Wilson's shift." [40]    Koenig offers

his opinion that he had obtained the data for "the relevant time period,"

without specifying what he believed the relevant time actually was. [41]

Accordingly, Koenig obtained only a partial download of Wilson's phone,

but in his opinion it was enough. [42]

Koenig devotes a substantial portion of his affidavit to his download

attempt of Hampton's phone the next day, May 15. [43]  Koenig claims he

could not download the data at the UP facility and gives a technical

---

[38] Tab 8, Exh. B.
[39] Tab 8, Exh. B.
[40] Tab 8, Exh. B.
[41] Tab 8, Exh. B.
[42] Tab 8, Exh. B.
[43] Tab 8, Exh. B.

11

explanation of his claim.[44]  Koenig's explanation constitutes his opinion,

and is disputed by the Trichel family.[45]

Because of the alleged problem with downloading at the UP facility,

Koenig took Hampton's phone to his home office, presumably by himself

because he does not specify whether anyone accompanied him.[46]   Koenig

testifies he performed a "data dump," resulting in the capture of 1.15 Gbs

of data.[47]  Koenig testifies this data was in a format he could not read.[48]  He

offers a lengthy technical explanation as to why he could not read the 1.15

Gbs of data he downloaded.[49]  Koenig's claim that he obtained this

significant volume of data but could not read any of it constitutes his

opinion, and is disputed by the Trichel family.[50]

Koenig testifies in his affidavit that following his download of 1.15

Gbs of "unreadable" data, he did not try to download the data on

---

[44] Tab 8, Exh. B.
[45] Tab 8, Exh B.
[46] Tab 8, Exh. B.
[47] Tab 8, Exh. B.
[48] Tab 8, Exh. B.
[49] Tab 8, Exh. B.
[50] Tab 8, Exh. B.

Hampton's phone again until 39 days later, on June 23, 2014, at the KRCL

law office.[51]  Koenig offers his opinions as to various technical reasons why

it took him so long to obtain this download in a format that was readable.[52]

The Trichel family disputes Koenig's opinions in this regard, and contends

the delay was intentional.[53]

**4.  The phone data was destroyed during Koenig's delay in downloading and preserving the data.**

During this 39-day delay, all the data on Hampton's phone

disappeared, despite the alleged active preservation activities of KRCL,

multiple UP personnel, and the forensics expert Koenig.[54]  Koenig testified

in his courthouse deposition that on June 23, 2014, Hampton "mentioned

that he had problems with his phone and he had taken it to his cell

provider and that they had fixed it, and that was the night before we

met."[55]  The Verizon records reveal that Hampton called Verizon at

---

[51] Tab 8, Exh. B.
[52] Tab 8, Exh. B.
[53] The intentional delay referred to here is part and parcel with the intentional destruction discussed in the Trichel's motion at Tab 9.
[54] Tab 14 [Koenig 120, 122, & 129]; Tab 9, Exh. 17, p. 22 [Email from Independent Forensics Expert, Lance Sloves].
[55] Tab 14 [Koenig 120 & 122]

11:34pm the night before the June 23 download asking about saving texts to his computer.[56] Koenig further testified that "I did not observe any data prior to 6/23/2014."[57] Thus, whatever Hampton did with his phone the night before Koenig's June 23 download resulted in all the pre-June 23 data being destroyed.

In its petition for writ of mandamus, UP contends Hampton allowed a Verizon employee to reset his phone without "fully realizing" this would delete all the data on it. [58, 59] This contradicts UP's other two stories in the record about why the data was destroyed, including the third story that Hampton allowed a Verizon employee to reset his phone because he thought the data on his phone had already been preserved (presumably by Koenig's May 15 download that is allegedly not readable). UP's third story raises the question of what was communicated to Hampton by Koenig,

---

[56] Tab 9, Exh. 18, p. 6.
[57] Tab 14 [Koenig 129].
[58] This is the most recent story, asserted in the petition for writ of mandamus, p. 3.
[59] Hampton claims he cannot recall the identity of the Verizon employee who he and Union Pacific claim reset his phone. Supp. Tab 18 [Response to Interrogatory No. 12].

14

KRCL and UP following Koenig's May 15 download that allegedly captured 1.15 Gbs of data that was allegedly not readable.[60]

Hampton was deposed on November 10, 2014, presented by his counsel at the time, KRCL. Before the deposition, KRCL advised via email on October 3, 2014 that Hampton's phone had been "wiped," explaining that "this apparently was done by his service provider inadvertently during the diagnosis of a battery problem."[61] This was the first time KRCL disclosed to the Trichel family's counsel that Hampton's phone had been wiped, even though the June 23 download of over three months prior allegedly would have revealed that fact to KRCL.

KRCL further advised in the same email that "[w]e have a download of the phone although I do not know what it contains and will absolutely reissue an instruction not to discard the phone."[62] If this is true, then

---

[60] According to a privilege log provided by UP, Koenig communicated with both UP personnel and KRCL attorneys by email on multiple occasions during his download activities in May and June of 2014, and during the 39-day delay when the phone data was erased. Supp. Tab 20. UP maintains that all of these communications are privileged on mandamus, but Hampton did not join.
[61] Tab 9, Exh. 1 [10/3/2014 Email from Rothman to Beckcom].
[62] Tab 9, Exh. 1 [10/3/2014 Email from Rothman to Beckcom].

Koenig did not tell Hampton or KRCL that his May 15 download of Hampton's phone resulted in the capture of 1.15 Gbs of data he could not read. It also means, assuming it is true, that KRCL did not bother asking Koenig if his May 15 download resulted in the preservation of any phone data, and stood idly by with UP during Koenig's 39-day delay that enabled the phone data to be erased.

On October 14, 2014, less than a month before Hampton's deposition, and eleven days after KRCL sent the email that Hampton's phone was "wiped," Hampton and a UP representative entered a Verizon store together and specifically instructed a Verizon employee to delete all the data on Hampton's cell phone except for some personal photos. [63] This is based on the testimony of the Verizon employee who handled this transaction, Natashia Smith. [64] According to Smith, who is obviously a disinterested witness, the UP representative also purchased a new phone for Hampton at the full cost of around $800, because Hampton was not yet

[63] Supp. Tab 16 [Smith 10-11].
[64] Supp. Tab 16 [Smith 10-11].

eligible for an upgrade.[65]   Hampton asked Smith multiple times to confirm

the data on Hampton's phone had been deleted.[66]   The UP representative

walked out of the store with Hampton's phone.[67]   Before doing so, the UP

representative also asked Smith to confirm that all the data on Hampton's

phone had been deleted.[68]

Smith's testimony refutes Hampton and UP's contention that

Hampton's phone was wiped by a Verizon employee on June 22, 2014 (day

38 of the 39-day delay created by Koenig), in that Ms. Smith was instructed

by Hampton and UP to wipe Hampton's phone on October 14, 2014.[69]   Her

testimony also contradicts Koenig's opinion that his June 23 download

resulted in the capture of almost no data.[70, 71]

---

[65] Supp. Tab 16 [Smith 10].
[66] Supp. Tab 16 [Smith 20].
[67] Supp. Tab 16 [Smith 55].
[68] Supp. Tab 16 [Smith 55].
[69] Further adding doubt to Hampton and UP's contention, on October 16, 2014, a KRCL lawyer emailed "Also, I do not actually know the extent of what happened to Mr. Hampton's phone when he took it in for service . . ." Tab 9, Exh. A.
[70] Tab 14 [Hampton 131-133, 139].
[71] Koenig's deposition notice was accompanied by a timely subpoena instructing him to bring the data, whatever it was, to the courthouse.  Supp. Tab 19 [Notice of Deposition for Will Koenig and subpoena duces tecum]. Despite a subpoena duces tecum instructing him to bring this data, Koenig did not bring it to the deposition, because,

During his deposition on November 10, 2014, Hampton initially denied using his phone around the time of the crash.[72] However, when presented with evidence of his Facebook usage that was independently acquired by the Trichel family via the internet, Hampton changed his testimony and admitted to engaging in some of the Facebook activity.[73] However, in answers to recent written discovery requests, Hampton has again changed his story, now asserting he "cannot admit or deny" any of the Facebook activities.[74]

Soon after Hampton's deposition, the KRCL law firm withdrew from representing him, and new counsel was assigned to Hampton.[75] Hampton's deposition aftermath included UP filing a charge against him

---

according to KRCL, it just "slipped through the cracks" at the KRCL law firm. (Tab 14 [Koenig 129].)

[72] Tab 8, Exh. C [Hampton 16-18].

[73] Tab 8, Exh. C [Hampton 30-45].

[74] Supp. Tab 18, Defendant Jeremy Hampton's Responses to Plaintiff Mary Trichel's Eighth Discovery Request to Defendant Jeremy Hampton.

[75] Supp. Tab 21 [Order Substituting Counsel of Record for Jeremy Hampton, issued December 10, 2014].

for "Conduct - Dishonest" for allegedly making "false statements."[76] This charge was based on Hampton's representation to UP that he did not have any prior felony convictions, when in fact Hampton had a prior felony conviction for burglary of a habitation.[77] Thereafter, Hampton resigned from UP.[78] Hampton's credibility issues increase the importance of allowing full discovery from Koenig related to the destruction of all data on Hampton's phone.

### 5. Koenig's opinions have been disclosed and are disputed.

Koenig's affidavit contains his numerous conclusions about the status of data on the phones in question, whether the data was or is readable, whether data exists, how much data exists, and the reason for the 39-day delay in obtaining the data from Hampton's phone that allowed the data to be erased.[79] All of Koenig's opinions are disputed by the Trichels.

---

[76] Supp. Tab 22 [Documents recently produced with Union Pacific Railroad Company's Objections and Responses to Mary Trichel's Thirteenth Set of Discovery Request to Defendant Union Pacific Railroad Company].

[77] Tab 8, Exh. C [Hampton 199].

[78] Supp. Tab 22.

[79] Tab 8, Exh. B.

UP and Hampton each deny the intentional destruction of evidence, offering three contradictory stories for why the evidence disappeared "accidentally." The Trichel family contends this was not an accidental wiping of Hampton's phone in the midst of the alleged evidence preservation work of Koenig, UP and KRCL, but rather an orchestrated campaign to intentionally destroy the evidence.[80] For the reasons set out below, no privilege applies to Koenig and the Trichel family is entitled to full discovery from this pivotal expert witness concerning his work, opinions and communications in this matter.

## ARGUMENT

As the party seeking mandamus relief, UP bears the burden of demonstrating its entitlement to relief.[81] UP's petition for writ of mandamus fails to so demonstrate. Mandamus is an extraordinary remedy that will issue only to correct a clear abuse of discretion.[82] Under this standard, the respondent can only be held to have abused its discretion if

---

[80] Tab 9, p. 12.

[81] *Walker v. Packer*, 827 S.W.2d 833, 837-39 (Tex. 1992); *In re Taylor*, 113 S.W.3d 385, 389 (Tex. App.—Houston [1st Dist.] 2003).

[82] *In re Taylor*, 113 S.W.3d 385, 389 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

UP establishes that the "trial court could have reached but one decision, and that it was not the one the trial court made."[83]

### 1. UP failed to satisfy its burden to prove its claims of privilege.

UP asserts the consulting expert and work product privileges as to Koenig. [84] UP bears the burden to prove its claims of privilege.[85] Under Rule 193.4, "[t]he party making the objection or asserting the privilege must present any evidence necessary to support the objection or privilege . . . [t]he evidence may be testimony presented at the hearing or affidavits served at least seven days before the hearing or at such other reasonable time as the court permits."[86]

During an oral hearing on May 28, 2015, the respondent ordered Koenig's deposition to take place in the court's jury room.[87] The respondent and all counsel discussed the fact that the court would be

---

[83] *In re Kristensen*, Cause No. 14-14-00448-CV, 2014 Tex. App. LEXIS 8404; 2014 WL 3778903 (July 31, 2014) citing *In re Ford Motor Co.*, 165 S.W.3d 360, 364 (Tex. 2005).
[84] RR 4, Tab 15.
[85] *In re DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004).
[86] Tex. R. Civ. P. 193.4.
[87] Supp. Tab 17, Transcript of May 28, 2015 Hearing.

available to make rulings on UP's expected claims of privilege during the deposition.[88]

Koenig's deposition was noticed by agreement among the parties to occur on June 25, 2015.[89] The Trichel family included a subpoena *duces tecum* with the notice.[90] UP produced a privilege log reflecting its objections to the document requests.[91] UP also objected to numerous questions during the deposition, asserting consulting expert and work product privileges.[92] Hampton did neither.

A consulting expert privilege applies to an expert

> (1) who is hired as consultant in preparation for trial,
>
> (2) who is not expected to testify,
>
> (3) who has no firsthand factual knowledge about the case and no secondhand factual knowledge except for knowledge acquired through the consultation, and

---

[88] Supp. Tab 17, Transcript of May 28, 2015 Hearing.
[89] Supp. Tab 19, Notice of Deposition for Will Koenig and subpoena *duces tecum*.
[90] Supp. Tab 19.
[91] Supp. Tab 20, Privilege Log produced by Defendant Union Pacific.
[92] Tab 14 [Koenig 43, 52-54, 73, 76, 77, 80, 82-83, 111-112, 113-114, 118, 119-120, 124-127, 129, 132-133, 134, 135, 136, 139-140, 141, 142].

22

(4) whose work product, opinions, or mental impressions are not reviewed by the testifying expert.[93]

The "work product" privilege covers:

"**(1)** material prepared or mental impressions developed in anticipation of litigation or for trial by or for a party or a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents; or

**(2)** a communication made in anticipation of litigation or for trial between a party and the party's representatives or among a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents."[94]

A party seeking to assert these privileges must make a prima facie

case showing their applicability, and must prove them up with evidence.[95]

---

[93] Tex. R. Civ. P. 192.3(e); Tex. R. Civ. P. 192.7(d); *In re Ford Motor Co.*, 988 S.W.2d 714, 719 (Tex. 1998)

[94] Tex. R. Civ. P. 192.5(a).

[95] Tex. R. Civ. P. 193.4(a); *In re DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004)(work product); *In re Ins. Placement Servs.*, 2011 Tex. App. LEXIS 5417, *7, 2011 WL 2768825 (Tex. App. Austin July 14, 2011)(finding that proponent failed to make a prima facie showing of the consulting expert privilege); *In re Kristensen*, 2014 Tex. App. LEXIS 8404, *13-14, 2014 WL 3778903 (Tex. App. Houston 14th Dist. July 31, 2014)(collecting cases and discussing that a prima facie case must be established with evidence by the proponent of any type of privilege).

The respondent overruled UP's privilege objections.[96]  After that,

counsel for UP asked the respondent, "[s]o is his status as a consulting

expert completely destroyed, does he maintain any of that status for

purposes of going forward?"[97]  In response to this question posed by UP's

counsel, the respondent ruled that Koenig's consulting status was

completely removed.[98]

UP did not offer any evidence supporting any elements of its claimed

consulting expert and work product privileges, and points to no such

evidence in its petition for writ of mandamus.  UP offered no affidavits

within seven days of the deposition, or at any time.  UP offered no

testimony from anyone.  Koenig's affidavit itself is silent as to any elements

of the claimed privileges.  In fact, Koenig's affidavit contains the broad

assertion that "Franklin Data was retained...to preserve data from the cell

phones of James Wilson and Jeremy Hampton," with no indication Koenig

was hired in any other role, such as that of a consulting or dual-capacity

---

[96] RR 18 (Tab 15 June 24, 2015 hearing).
[97] RR 21 (Tab 15 June 24, 2015 hearing).
[98] RR 22 (Tab 15 June 24, 2015 hearing).

expert.[99]  In fact, after filing its petition for writ of mandamus, UP designated Koenig to testify to matters in his "deposition as well as any other information they may have."[100]  As a result, UP has not met its burden to prove the privileges, and they do not apply to Koenig.

## 2. The consulting expert privilege never attached to any of Koenig's work or opinions.

Koenig's work was never protected by the consulting expert privilege because his affidavit discloses his opinions rather than merely "factual matters," and because UP did not designate Koenig as a consulting expert.

### 2.1 Koenig's affidavit discloses his opinions and communications, not merely "factual matters."

UP argues the consulting expert privilege protects Koenig's work because his affidavit only disclosed "non-privileged factual information"[101] and "factual matters."[102]  However, this premise forming the basis of Union Pacific's primary argument is incorrect.  A review of Koenig's affidavit

---

[99] Tab 8, Exh. B.

[100] Supp. Tab 23, [Union Pacific Railroad Company's Third Amended Response to Plaintiffs' Requests for Disclosures and Omnibus Response to Outstanding Discovery Requests and Designation of Experts, p. 12]

[101] UP's Petition, p. 8.

[102] UP's Petition, pp. 7, 13.

reveals several of his opinions, as set forth above.  And, Koenig's disclosed

opinions relate to the heart of the matter UP hired him for:  preservation of

the data on the two employees' cell phones that were both destroyed.

In addition, UP argues that Koenig's affidavit "did not reveal his . . .

communications with attorneys."[103]  However, in his affidavit, Koenig

testifies that "[n]o one instructed me or anyone else at Franklin Data to

delete or to wipe any information from these cell phones."[104]  In making

this blanket statement about what was *not* communicated to him *by anyone*,

Koenig opens the door to be examined on what his communications were

with anyone, including the counsel who hired him.[105]

## 2.2  UP did not designate Koenig as a consulting expert when it disclosed his affidavit.

UP correctly points out that a consulting expert is one who has been

retained by a party "in anticipation of litigation or in preparation for trial,

---

[103] UP's Petition, p. 12.

[104] Tab 8, Exh. C.

[105] See *Mundy v. Shippers*, Inc., 783 S.W.2d 743, 745 (Tex. App.—Houston [14th Dist.] 1990, writ denied)(witness who testified she had no financial resources to pay bills opened the door to evidence of all financial resources).

but who is not a testifying expert."[106]  However, in his affidavit, Koenig

does not indicate that he was retained "in anticipation of litigation or in

preparation for trial," nor that he is "not a testifying expert," nor that his

retention was in any way limited to a consulting or dual capacity role.

And UP, in its pleading to which it first attached Koenig's affidavit,

does not designate Koenig as a consulting or dual capacity expert.  Rather,

UP uses the affidavit in affirmatively requesting relief for what it claims

was a groundless and bad faith pleading filed by the Trichel family, as

shown below.

### 3.  UP waived any consulting expert privilege.

The consulting expert privilege may be waived by a party's

voluntary disclosure or offensive use.[107]  "If the matter for which a

---

[106] UP's Petition, p. 8.

[107] *Tom L. Scott, Inc. v. McIlhany*, 798 S.W.2d 556, 560 (Tex. 1990) (privilege waived by offensive use when designated testifying experts were redesignated as consulting experts pursuant to settlement agreement in multiparty case); *In re Ortuno*, No. 14-08-00457-CV, 2008 Tex. App. LEXIS 5511, 2008 WL 2855028, at *2 (Tex. App.-Houston [14th Dist.] July 24, 2008, orig. proceeding) (mem. op.) (privilege waived where party voluntarily disclosed privileged information in open court); *Mendez*, 234 S.W.3d at 111 (privilege waived as to facts stated in controverting affidavit provided by consulting expert); *Hardesty v. Douglas*, 894 S.W.2d 548, 551 (Tex. App.-Waco 1995, orig.

privilege is sought has been disclosed to a third party, thus raising the question of waiver of the privilege, the party asserting the privilege has the burden of proving that no waiver has occurred."[108]   Although UP disclosed Koenig's opinion-laden affidavit on numerous occasions, it never produced any evidence that no waiver had occurred.  In fact, UP points to no evidence in the record even addressing the charge of waiver.

In *In re Ortuno*, the Fourteenth Court of Appeals denied mandamus relief from a trial court's order denying the plaintiff consulting-expert protection with respect to one of her doctors.[109]  Ortuno asserted the consulting expert privilege when learning that a report drafted by her treating physician had been disclosed to the defendant during third-party discovery.[110]  Ortuno sought protection from the trial court on the basis of the consulting expert privilege, and in pursuing that objection she filed

---

proceeding) (privilege waived by offensive use where testifying expert used in integral part of case was then redesignated as consulting expert).
[108] *Jordan v. Court of Appeals for Fourth Supreme Judicial Dist.*, 701 S.W.2d 644, 648-49 (Tex. 1985).
[109] *In re Ortuno*, No. 14-08-00457-CV, 2008 Tex. App. LEXIS 5511, 2008 WL 2855028, at *2 (Tex. App.-Houston [14th Dist.] July 24, 2008, orig. proceeding) (mem. op.).
[110] Id.

unsealed copies of the report with the court, then again in the mandamus proceeding.[111]

The court of appeals set out to determine whether Ortuno's waiver was intended or unintended.[112] The fact that the voluntary disclosure occurred multiple times was dispositive on the issue. Justice Jeff Brown, writing for the panel, specifically noted that "Ortuno has voluntarily filed unsealed copies of the Caudle report on at least two occasions," and for that reason found that Ortuno failed to carry "her burden of demonstrating that she did not waive the consulting-expert privilege."[113] Similarly, UP and Hampton voluntarily disclosed Koenig's affidavit on numerous occasions, and for that reason alone cannot carry their burden to show that they have not waived the consulting-expert privilege.

Further, UP and Hampton have waived these privileges under Tex. R. Evid. 511, as they "voluntarily disclosed" (and "consented to the

---

[111] Id. at *4-8.
[112] *In re Ortuno*, at *4.
[113] *In re Ortuno*, at *8.

disclosure") of Koenig's opinions and their communications with Koenig, which constitute a "significant part" of the disputed privileged matter.

UP waived any privilege in several other ways.

> ### 3.1  UP is using the Koenig affidavit offensively to try to obtain affirmative relief based on its claim that the Trichel family filed a groundless pleading in bad faith.

UP argues the offensive use doctrine does not apply to its use of the Koenig affidavit because UP is not seeking "affirmative relief."[114]  Again, the premise forming the basis of UP's argument is incorrect.

On January 16, 2015, UP filed its pleading to which it first attached the Koenig affidavit.[115]  In the pleading, UP uses the Koenig affidavit as support for the following affirmative claims it lodged against the Trichel family:

- "Union Pacific contends they made that assertion [of spoliation] without any evidence whatsoever and in bad faith.  It is false and Union Pacific contends it was designed by the opposing attorneys to mislead this Court and taint its views.  Union Pacific contends it was filed in bad faith, as

---

[114] UP's Petition, pp. 7 &12.
[115] Tab 8 & Tab 8, Exh. B [Koenig Affidavit].

30

established by the attached affidavit [attaching Koenig affidavit]."[116]

- "Union Pacific believes that the Court should make a finding that the statement was groundless and brought in bad faith and/or groundless and brought for the purpose of harassment and reserves all rights in this regard."[117]

- "This statement [of spoliation] is utterly groundless and contrary to the affidavit of Will Koenig."[118]

- "This allegation [of spoliation] likely violates Tex. R. Civ. P. 13 on the filing of groundless and baseless pleadings."[119]

- "Defendant Union Pacific requests . . . such other relief, legal and equitable, to which Union Pacific is justly entitled."[120]

In using the Koenig affidavit offensively to prove its claim that the Trichel family filed a groundless pleading in bad faith, UP waived any privilege.

In *Tom L. Scott, Inc. v. McIlhany*, the Supreme Court of Texas addressed the policy issues inherent when the consulting expert privilege

---

[116] Tab 8.
[117] Tab 8.
[118] Tab 8.
[119] Tab 8.
[120] Tab 8.

is used offensively as a sword in litigation.[121] *McIlhany* involved a well-head explosion with multiple parties on each side of the case.[122] When Apache and El Paso settled with some of their adversaries in the suit, they took control of six of the settling parties' experts.[123] At that juncture, Apache and El Paso designated those experts as their own consulting experts.[124] Some of the remaining plaintiffs wanted testimony from the experts, but the trial court refused, upholding the consulting expert privilege.[125] The supreme court disapproved and explained:

> The primary policy behind discovery is to seek truth so that disputes may be decided by facts that are revealed rather than concealed. Privileges from discovery run contrary to this policy but serve other legitimate interests. The policy behind the consulting expert privilege is to encourage parties to seek expert advice in evaluating their case and to prevent a party from receiving undue benefit from an adversary's efforts and diligence. But the protection afforded by the consulting expert privilege is intended to be only "a shield to prevent a litigant from taking undue advantage of his

---

[121] *Tom L. Scott, Inc. v. McIlhany*, 798 S.W.2d 556 (Tex. 1990).
[122] Id. at 557.
[123] Id. at 558.
[124] Id. at 559.
[125] Id.

adversary's industry and effort, not a sword to be used to thwart justice or to defeat the salutary objects" of discovery.[126]

The court ultimately rejected the claim of consulting expert privilege and allowed the discovery, holding that the "redesignation of the experts in this case was an offensive and unacceptable use of discovery mechanisms intended to defeat the salutary objectives of discovery"[127]

UP's use of Koenig's testimony to support an attack on the Trichel family followed by its assertion of consulting expert privilege is inconsistent and violates the fundamental policies addressed by the *McIlhany* Court.[128]

### 3.2  Koenig's affidavit is not limited to "factual matters."

In arguing it did not waive the consulting expert privilege, UP again claims Koenig's affidavit is limited to "factual matters."[129]  As already set forth herein, Koenig's affidavit contains multiple opinions that are

---

[126] *Id.* (internal citations omitted).
[127] Id. at 560.
[128] See *Tex. Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 761 (Tex. 1995)(party who seeks affirmative relief is not permitted to maintain the action and at the same time maintain evidentiary privileges that shield from discovery crucial information not otherwise available to other parties).
[129] UP's Petition, p. 11.

33

disputed by the Trichel family, as well as a blanket statement of what was not communicated to him *by anyone*, and is therefore not limited to factual matters.

### 3.3  UP's alleged invitation to participate jointly in the preservation of Hampton's phone is contrary to its assertions of privilege.

In its petition for writ of mandamus, UP indicates it hired Koenig "to retrieve the data from Hampton's phone," then details some of the work Koenig undertook.[130]  UP represents that it "sent a letter to the Trichels, suggesting ways that the parties could work together to preserve evidence."[131]

The letter UP is referencing is dated May 23, 2014.[132]  UP states in its petition that "[t]he Trichels did not respond to that information."[133]  However, the Trichel family's counsel did respond to that May 23 letter via email on May 27, as follows:  "Hi, I just now received this.  I have not had time to study the letter yet, beyond the point that I have requested the

---

[130] UP's Petition, p. 2.
[131] UP's Petition, p. 2.
[132] Tab 10, Exh. A.
[133] UP's Petition, p. 3.

entire UP truck and trailer to continue to be preserved, which stands until further notice. I will address the rest when I have a chance to review it in conjunction with our experts. Thanks."[134] Despite this email, UP went ahead and had Koenig do further download work on the Hampton phone on June 23, 2014, as detailed in his affidavit, without notice to the Trichel family.[135]

It is clear that the work UP was referencing in its May 23, 2014 letter was the evidence preservation work being performed by Koenig. If UP interprets its May 23 letter to the Trichel family's counsel as "suggesting ways that the parties could work together to preserve evidence," then this is an additional reason to deny UP's privilege claims. Inviting the Trichel family to "work together" with Koenig to preserve evidence on Hampton's phone is not consistent with a later claim that Koenig's opinions and

---

[134] Tab 10, Exh. A.
[135] Tab 8, Exh. C.

35

communications are privileged, and is an additional way UP has waived

any claim of privilege.[136]

**4. Koenig's affidavit has been reviewed by two testifying experts, allowing full discovery of Koenig's opinions under TRCP 192.3(e).**

Under Rule 192.3(e) "[a] party may discover the following

information regarding a testifying expert or regarding a consulting expert

whose mental impressions or opinions have been reviewed by a testifying

expert . . .":

> the expert's mental impressions and opinions
> formed or made in connection with the case in
> which discovery is sought, and any methods used
> to derive them;[137]

Importantly, this rule does not limit the discovery of a consulting

expert's opinions in this scenario to those that may have been disclosed.

Rather, it says "[a] party may discover . . . the expert's mental impressions

---

[136] See *Cameron County. v. Hinojosa*, 760 S.W.2d 742, 746 (Tex. App.—Corpus Christi 1988, orig. proceeding)(circumstantial evidence that communications were intended to be confidential supported trial court's conclusion that privilege did not apply).
[137] Tex. R. Civ. P. 192.3(e)(4).

and opinions formed or made *in connection with the case in which discovery is sought . . .*"[138]

UP disclosed Koenig's affidavit, which contains multiple opinions on the evidence preservation issue.[139] The affidavit has been reviewed by a testifying expert agreed to by the parties, Mr. Lance Sloves, as well as the Trichel family's own testifying expert, Mr. Paul Price.[140] Accordingly, under Rule 192.3(e), the Trichel family is entitled to full discovery of Koenig's "mental impressions and opinions formed or made in connection with" this case. The consulting expert privilege does not apply to Koenig at all for this additional reason.

---

[138] Id. (emphasis added).

[139] Tab 8, Exh. C.

[140] RR 6, Tab 15. Importantly, the rule does not require that the reviewing expert and consulting expert be on the same side. Tex. R. Civ. P. 192.3(e); *Martin v. Boles*, 843 S.W.2d 90, 92 (Tex. App.—Texarkana 1992) (When construing the prior rule [Rule 166b(3)), which is worded identically in this respect to Rule 193.3(e)], the court explained that rule "does not require that the consulting expert and testifying expert be retained by the same party").

**5. UP fails to address the bulk of the questions it instructed Koenig not to answer and has thus waived any objection to those questions.**

Counsel for UP instructed Koenig not to answer numerous questions during his June 25, 2015 deposition, based on privilege.[141] Asserting work product, attorney-client, and consulting expert privileges, counsel for UP instructed Koenig not to answer deposition questions over two dozen times.[142] UP carries the burden on each of these queries and the record demonstrates its utter failure to discharge that burden.

Koenig refused to answer dozens of these questions on the instruction of UP's lawyers, which Hampton's lawyers joined on numerous questions. Thereafter, both UP's and Hampton's lawyers argued to the respondent that Koenig's opinions were protected.[143] UP failed to address any of these questions in its petition for writ of mandamus. (Hampton does not seek mandamus relief.) As a result, UP has waived any complaint

---

[141] Tab 14 [Koenig 43, 52-54, 73, 76, 77, 80, 82-83, 111-112, 113-114, 118, 119-120, 124-127, 129, 132-133, 134, 135, 136, 139-140, 141, 142].
[142] Tab 14 [Koenig 43, 52-54, 73, 76, 77, 80, 82-83, 111-112, 113-114, 118, 119-120, 124-127, 129, 132-133, 134, 135, 136, 139-140, 141, 142]
[143] RR 7-9 (UP), RR 9-10 (Hampton) [Tab 15].

as to the respondent's ruling with respect to any of those specific

questions.[144]

**PRAYER**

The Trichel family respectfully requests that the court deny the

petition for writ of mandamus.

---

[144] Tab 14 [Koenig 43, 52-54, 73, 76, 77, 80, 82-83, 111-112, 113-114, 118, 119-120, 124-127, 129, 132-133, 134, 135, 136, 139-140, 141, 142].

## RULE 52.3(J) CERTIFICATION

In compliance with Rule 52.3(j) of the Texas Rules of Appellate Procedure, I certify that I have reviewed the response and have concluded that every factual statement in the response is supported by competent evidence included in the appendix or record.

/s/ *Vuk Vujasinovic*

VUK VUJASINOVIC

July 30, 2015

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of this Response to Petition for Writ of Mandamus have been forwarded to all counsel listed below on this 30th day of July 2015, in compliance with the Texas Rules of Appellate Procedure.

Kent Rutter | Kent.Rutter@haynesboone.com
Christina Crozier | Christina.Crozier@haynesboone.com
HAYNES AND BOONE, LLP
1221 McKinney, Suite 2100
Houston, Texas 77010-2007
713.547-2000
713.547-2600 *fax*

Marcy Lynn Rothman | MRothman@krcl.com
M. Daniel Guerra | DGuerra@krcl.com
KANE RUSSELL COLEMAN & LOGAN PC
919 Milam Street, Suite 2200
Houston, Texas 77002
713.425-7444
713.425-7700 *fax*

Adolfo R. Rodriguez, Jr.
Wilson C. Aurbach | waurbach@therodriguezfirm.com
Christopher K. Rusek
RODRIGUEZ LAW FIRM, P.C.
1700 Pacific Ave., Suite 3850
Dallas, Texas 75201

*/s/ Vuk Vujasinovic*

VUK VUJASINOVIC

CERTIFICATE OF COMPLIANCE

On this 30th day of July 2015, I certify that the forgoing response complies with the type-volume limitation of Tex. R. App. P. 9.4(i)(2)(B) because this response contains 7,358 words.

This response complies with the typeface requirements of Tex. R. App. P. 9.4 because this brief has been prepared on a computer using a conventional typeface Microsoft Word in Palatino Linotype, 14 point type. Footnotes are in the same font, reduced to 12 point font.

*/s/ Vuk Vujasinovic*

VUK VUJASINOVIC

No. 01-15-00600-CV

_____

IN THE
FIRST COURT OF APPEALS
AT HOUSTON, TEXAS

_____

*IN RE UNION PACIFIC RAILROAD COMPANY*

_____

From the 129th Judicial District Court of
Harris County, Texas
Cause No. 2014-23177

_____

**APPENDIX TO REAL PARTY IN INTEREST'S RESPONSE TO
PETITION FOR WRIT OF MANDAMUS**

_____

Vuk Vujasinovic
State Bar No. 00794800
Vuk@vbattorneys.com
Brian Beckcom
State Bar No. 24012268
Brian@vbattorneys.com
VB Attorneys
6363 Woodway Dr., Suite 400
Houston, Texas 77057
713.224.7800
713.224.7801 fax

Levon Hovnatanian
State Bar No. 10059825
Hovnatanian@mdjwlaw.com
Dale Jefferson
State Bar No. 10607900
Jefferson@mdjwlaw.com
Martin, Disiere, Jefferson &
Wisdom, L.L.P.
808 Travis, 20th Floor
Houston, Texas 77002
713.632.1717
713.222.0101 fax

*Appellate Counsel for Real Party in Interest,*
*Donald and Mary Trichel, Individually and as Permanent Co-Guardians of the*
*Person and Estate of Nicholas Trichel, Incapacitated*

APPENDIX
LIST OF DOCUMENTS

Appendix 1:     Affidavit of Will Koenig

Appendix 2:     Tex. R. Evid. 511

# Appendix 1:
# Affidavit of Will Koenig

CAUSE NO. 2014-23177

| | | |
|---|---|---|
| DONALD AND MARY TRICHEL, | § | IN THE DISTRICT COURT OF |
| Individually and as Next Friends of | § | |
| NICHOLAS TRICHEL | § | |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| UNION PACIFIC RAILROAD | § | |
| COMPANY AND | § | |
| JEREMY RAY HAMPTON | § | 129th JUDICIAL DISTRICT |

## AFFIDAVIT OF WILL KOENIG

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned notary, on this day personally appeared Will Koenig, personally known to me, who being first duly sworn, upon his oath stated as follows:

My name is Will Koenig. I am a Director for Franklin Data and am authorized to make this affidavit on its behalf. I am over eighteen (18) years of age, and I am fully competent in all respects to make this affidavit. I have never been convicted of a felony or crime of moral turpitude. All statements herein are true and correct and within my personal knowledge.

Franklin Data was retained by Union Pacific Railroad Company ("Union Pacific") to preserve data from the cell phones of James Wilson and Jeremy Hampton. No one instructed me or anyone else at Franklin Data to delete or to wipe any information from these cell phones.

Once Franklin Data received notification of the particular type of cell phone and its operating system, I checked the supported device compatibility with our current cell phone forensic technology. Based on the information known about the cell phones and the operating systems of the phones, both Mr. Wilson's and Mr. Hampton's phones were supported by the Paraben forensic software.

On Tuesday, May 13, 2014, I, along with Gary Wellman from Franklin Data, met counsel for Union Pacific, Angela Offerman, and James Wilson and Jeremy Hampton at the Starbucks located at 10777 North Freeway, Houston, Texas 77037 to forensically acquire data from Mr. Wilson's and Mr. Hampton's cell phones using the Paraben forensic software.

I began the acquisition of data from Mr. Wilson's phone. During this process, Mr. Wilson informed me that this phone was not the same phone as he had on April 15, 2014. He told me that approximately 1 ½ weeks following the accident, his phone was crushed by one of his horses. However, Mr. Wilson told me that his current phone had the same SIM card. I spent approximately 2 ½ hours attempting to retrieve the data from Mr. Wilson's cell phone. While the

data acquisition process was occurring, Mr. Wilson informed me that he needed to leave to pick up his daughter. At that time, the data acquisition was only about 30 percent complete. I estimated that the imaging process would take another four hours so I disconnected the phone and returned it to Mr. Wilson.

On May 14, 2014, I traveled to the Union Pacific Lloyd Yard office trailer to continue the data acquisition process. I began imaging Mr. Wilson's cell phone at approximately 7:30 a.m. At approximately 3:15 p.m., at the end of Mr. Wilson's shift, the imaging process had not completed; however, I believed that I had obtained the data for the relevant time period. Therefore, I returned Mr. Wilson's cell phone to him. Subsequently, I reviewed the data from Mr. Wilson's phone and confirmed that I had obtained all the data contained on the phone from the relevant time period that was available the the cell phone.

On May 15, 2014, I returned to the Lloyd Yard office trailer to retrieve data from Mr. Hampton's cell phone. I began the process at approximately 8:00 a.m. I attempted to utilize the Paraben forensic software while onsite at the Lloyd Yard office trailer. However, I determined that specific drivers for Mr. Hampton's cell phone were not present on the collection system and needed to be downloaded from the software developer's website. Since there was no internet data at the Lloyd Yard office trailer, I decided to download and install these drivers on my computer back in my office.

I was able to perform a data dump of Mr. Hampton's phone. During this process, I was able to obtain approximately 1.15 Gbs of data. This data dump should include pictures but it does not include the "relational aspect of the tables." That is, cell phones manage data in a SQLight database environment rather than a file environment as on a computer. Thus, in a cell phone, each piece of data is held separately and organized by the "relational aspect of the tables." What this means is that each aspect of a text is stored as a "field" of a database within the phone (*i.e.*, time of the text is in a field, date of text is in a field, the characters of a text is in a field, etc). However, to organize the fields you must have the "relational aspect of the tables." Without the "relational aspect of the tables" any data concerning texts, phone calls, or related information cannot be deciphered. That is, any data currently collected that contains information regarding texts or phone calls is useless until it is properly associated with the other bits of data that make up a single text or call (such as time, duration, number, etc.). I am still in possession of the 1.15 Gbs of data downloaded from Mr. Hampton's phone.

The difficulty in retrieving the data from Mr. Hampton's phone related to the Android operating system. The operating systems of Android phones are open architecture software. As a result, there are a multitude of different Android operating system versions.

Because of the inability of the Paraben forensic software to forensically capture the data from Mr. Hampton's phone, I decided that a different software tool was required. After some research, I identified Oxygen Forensic software as being the best suited for the phone and phone OS. During the next weeks, I spent hours on the phone with technical support to work through the configuration settings for acquisition for a devise with that OS.

2

3145866 v1 (75000 00095 000)

On June 23, 2014, I met with Mr. Hampton at the offices of Union Pacific's attorneys at Kane Russell Coleman & Logan, PC, 919 Milam St., Suite 2200, Houston, Texas 7700 to complete the acquisition of Mr. Hampton's phone. Using Oxygen Forensic software I was able to create an image Mr. Hampton's phone.

Further, Affiant sayeth not.

_____
Will Koenig

SUBSCRIBED AND SWORN TO BEFORE ME by Will Koenig on this the 13th day of January, 2015, to certify which witness my hand and official seal.

_____
Notary Public, State of Texas

JEANNINE MARIE COOLEY
My Commission Expires
October 31, 2016

Unofficial Copy Office of Chris Daniel District Clerk

3

# Appendix 2:
# Tex. R. Evid. 511

# Tex. Evid. R. 511

This document is current through April 8, 2015

Texas Court Rules > STATE RULES > TEXAS RULES OF EVIDENCE > ARTICLE V. PRIVILEGES

## Rule 511 Waiver by Voluntary Disclosure

**(a)** *General Rule.* A person upon whom these rules confer a privilege against disclosure waives the privilege if:

**(1)** the person or a predecessor of the person while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure itself is privileged; or

**(2)** the person or a representative of the person calls a person to whom privileged communications have been made to testify as to the person's character or character trait insofar as such communications are relevant to such character or character trait.

**(b)** *Lawyer-Client Privilege and Work Product; Limitations on Waiver.* Notwithstanding paragraph (a), the following provisions apply, in the circumstances set out, to disclosure of a communication or information covered by the lawyer-client privilege or work-product protection.

**(1)** *Disclosure Made in a Federal or State Proceeding or to a Federal or State Office or Agency; Scope of a Waiver.* --When the disclosure is made in a federal proceeding or state proceeding of any state or to a federal office or agency or state office or agency of any state and waives the lawyer-client privilege or work-product protection, the waiver extends to an undisclosed communication or information only if:

**(A)** the waiver is intentional;

**(B)** the disclosed and undisclosed communications or information concern the same subject matter; and

**(C)** they ought in fairness to be considered together.

**(2)** *Inadvertent Disclosure in State Civil Proceedings.* --When made in a Texas state proceeding, an inadvertent disclosure does not operate as a waiver if the holder followed the procedures of Rule of Civil Procedure 193.3(d).

**(3)** *Controlling Effect of a Court Order.* --A disclosure made in litigation pending before a federal court or a state court of any state that has entered an order that the privilege or protection is not waived by disclosure connected with the litigation pending before that court is also not a waiver in a Texas state proceeding.

**(4)** *Controlling Effect of a Party Agreement.* --An agreement on the effect of disclosure in a state proceeding of any state is binding only on the parties to the agreement, unless it is incorporated into a court order.

Texas Rules

Copyright © 2015 by Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.